1           UNITED STATES DISTRICT COURT

2           EASTERN DISTRICT OF LOUISIANA

3

4

5   ROBERT WEISLER, III          CIVIL ACTION
                                 NO. 16-14582
6   VS.

7   JEFFERSON PARISH             SECTION "G"(4)
    SHERIFF'S OFFICE
8   AND OFFICER "DOES"

9

10                    *    *    *

11

12          Deposition of ROBERT R. WEISLER, III,

13   taken in the above-entitled cause, pursuant

14   to the following stipulation, before Ann M.

15   Downs, a Certified Court Reporter, authorized

16   to administer oaths of witnessess and to take

17   depositions, pursuant to Title 13 of the

18   State of Louisiana, given in the law offices

19   of Martiny & Associates, LLC, 131 Airline

20   Highway, Suite 201, Metairie, Louisiana

21   70001, on the 10th day of August, 2017

22   commencing at 9:05 a.m.

23                    *    *    *      ORIGINAL

24

25

EXHIBIT

tabbies®

3

```
 1    APPEARANCES:

 2


 3    Representing Robert Weisler, III:

 4         JACQUELINE C. BARBER, ESQ.
           7611 Maple Street
 5         Suite A3
           New Orleans, Louisiana 70118
 6

 7


 8    Representing Sheriff Newell Normand,
         Dep. Travis Enclard, Dep. Julio
 9       Alvarado, Dep. Mike Leyva, Dep.
         Russell Varmall and Dep. Blake
10       Hollifield:

11         MARTINY & ASSOCIATES, LLC
           BY:  JEFFREY D. MARTINY, ESQ.
12         131 Airline Highway
           Suite 201
13         Metairie, Louisiana 70001

14

15

16    Also Present:   Deputy Travis Enclard
                      Sergeant Julio Alvarado
17

18

19

20

21

22

23    REPORTED BY:

24

25    ANN M. DOWNS
      Certified Court Reporter
```

S T I P U L A T I O N

1   It is hereby stipulated and agreed by
2   and between all parties that the deposition
3   of ROBERT R. WEISLER, III is hereby being
4   taken pursuant to the Federal Rules of Civil
5   Procedure for all purposes.  That all
6   formalities of sealing, certification and
7   filing are hereby waived.  That the witness
8   reserves the right to read and sign the
9   deposition.  That all objections, save those
10  as to the form of the question and the
11  responsiveness of the answer are reserved
12  until the time of the trial of the cause.
13                  *   *   *
14           ROBERT R. WEISLER, III, 5328
15           Loring Drive, Marrero, Louisiana
16           70072, a witness having been first
17           duly sworn in the cause to tell
18           the truth, testified on his oath
19           as follows:
20  BY MR. MARTINY:
21  Q.  Good morning, Mr. Weisler.  My name is
22       Jeff Martiny.  I represent Sheriff
23       Newell Normand and the Jefferson Parish
24       Sheriff's Office in this case that you

```
 1            have filed against I believe Sheriff
 2            Normand and some of the deputies sitting
 3            here today.  First off, have you ever
 4            given a deposition before?
 5    A.      Yes, sir.
 6    Q.      So the only request that I have is that
 7            if you just let me finish my question
 8            before you start answering.  If you
 9            don't understand the question I ask,
10            just stop me and say you don't under-
11            stand or I'm confusing you because I
12            have a tendency to kind of jump around.
13            But if you answer the question, I'm
14            going to assume you've understood; is
15            that fair?
16    A.      Yes, sir.
17    Q.      If you need a break at any time, please
18            let me know.  I just ask that if it's in
19            the middle of a question, will you
20            answer the question first, then take a
21            break.
22    A.      Okay.
23    Q.      Sounds good?  Okay.  Can you state your
24            name for the record, please?
25    A.      Robert R. Weisler, III.
```

```
 1    Q.    And where do you live, Mr. Weisler?
 2    A.    5328 Loring, L-O-R-I-N-G, Drive,
 3          Marrero, 70002 -- I mean no, 70072.  I
 4          used to live in Metairie.
 5    Q.    Do you currently work?
 6    A.    No, sir.
 7    Q.    When is the last time you worked?
 8    A.    2008, October.
 9    Q.    October 2008.  What were you doing in
10          October of 2008?
11    A.    I was working out at Stennis, NASA with
12          the government printing office.  I was
13          what they call a special police officer.
14          My rank was a colonel and I was second
15          in command.  Other than the project
16          manager, it fell to me to run all the
17          physical and electronic security.
18    Q.    So for the facility itself, you were --
19    A.    Right, they made passports there and it
20          was a lockdown.
21    Q.    When did you start working at the
22          Stennis Center?
23    A.    I think in January that year.
24    Q.    January of '08 through October of '08?
25    A.    Yes, sir.
```

1   Q.   And what about before that?

2   A.   Before that.

3   Q.   I guess your proceeding job to that?

4   A.   I worked for Inner Parish, Inner Parish

5        Security or company or something.  What

6        we were doing, we was doing all the

7        Katrina stuff.

8   Q.   Who were you working for at that time?

9        Who was your boss or company?

10  A.   What's the name of that company?  I'm

11       not sure.  It's C something.  It was

12       initials.

13  Q.   Do you know when you started that job?

14  A.   I would say it was in 2006.

15  Q.   And you would have worked there up until

16       January of 2008 before you took the job

17       at Stennis or was there a period of time

18       before you took it?

19  A.   No, I went -- I went to the Inner Parish

20       place and I was an instructor for the

21       federal guard level 2 academy so I

22       trained -- I trained all these people

23       coming through to work for the govern-

24       ment guarding all these trailer park

25       things.



1  Q.  So this would have been after Katrina,
2      you were brought in to teach these new
3      recruits I guess you could say?
4  A.  Right.
5  Q.  How to sufficiently protect certain
6      areas of the city?
7  A.  Right, I was the instructor.  I was
8      pepper spray instructor.  I worked on
9      hand-to-hand combat. I was the CPR first
10     aid AED instructor.
11 Q.  So you started sometime in 2006 and you
12     said when did you finish that?
13 A.  I'm thinking at the end of 2006.  It's
14     hard.  I can't recall exactly.
15 Q.  So prior to that, were you employed
16     before that?
17 A.  The job I had before that, I worked for
18     Jesse Duplantis Ministries.
19 Q.  And what did you do for Jesse Duplantis
20     Ministries?
21 A.  I was head of security, I did all the
22     personal protection, flew with him on
23     the plane.
24 Q.  Is he a preacher?
25 A.  He's a preacher.

1    Q.    And where is he based out of?

2    A.    Destrehan.

3    Q.    Destrehan, and do you know when you

4        started that job?

5    A.    2004.

6    Q.    And you worked through when with

7        Mr. Duplantis?

8    A.    I'm thinking the end of 2005.

9    Q.    So prior do Jesse Duplantis Ministries,

10       were you employed?

11    A.    Yes, sir.

12    Q.    What was your previous job prior to

13       Jesse Duplantis?

14    A.    I worked at Wackenhut.

15    Q.    What's that?

16    A.    Wackenhut.

17    Q.    What is Wackenhut?

18    A.    It's a security company.

19    Q.    And that would have been based where?

20    A.    In New Orleans.

21    Q.    Do you know the dates that you worked at

22       the Wackenhut?

23    A.    Not really, sir.

24    Q.    I mean generally.  I'm not asking for

25       like January 1st, just years would be

```
 1            sufficient if you can remember that.
 2    A.      I started right after 9/11 because I was
 3            head of the security detail out at one
 4            of the refineries and that's when they
 5            were scared that somebody would come in
 6            through a train and, you know, use a
 7            bazooka or a LAWs or something to blow
 8            up the refineries.
 9    Q.      So after 9/11 sometime late 2001, you
10            started working at the Wackenhut and
11            your job there was the head of security
12            at the refineries that they managed?
13    A.      Yes, sir.
14    Q.      And where were those refineries?
15    A.      Norco.
16    Q.      And how long did you work as the head of
17            security at the refineries for
18            Wackenhut?
19    A.      I'm guessing up until I got the job with
20            Jesse Duplantis.
21    Q.      So maybe end of 2003, 2004, somewhere in
22            that period?
23    A.      Yes, sir.
24    Q.      Prior to Wackenhut, where did you work?
25    A.      Hancock County Sheriff's Office.
```

```
 1   Q.   And that's Hancock, Mississippi?
 2   A.   Yes, sir.
 3   Q.   When did you start there?
 4   A.   I'm thinking it's either end of January,
 5        beginning of February, 2000.
 6   Q.   And you worked there for how long?
 7   A.   Till July of 2001.
 8   Q.   And what was your title at the Hancock
 9        County Sheriff's Office?
10   A.   Deputy.
11   Q.   Deputy, okay.  Why did you leave Hancock
12        County Sheriff's Office in July of 2001?
13   A.   I was living -- I was living in Metairie
14        at the time so I was driving Metairie to
15        Hancock County which is about an hour
16        give or take, working a 12-hour shift,
17        driving back an hour and doing that
18        every two days and then every three days
19        so I just -- it was just too much to
20        handle so I just said, you know, I'll go
21        do something else.
22   Q.   So you just resigned from your job at
23        Hancock?
24   A.   Yeah, I gave two weeks' notice, worked
25        the two weeks and resigned.
```

1    Q.    So you only worked there for it looks

2          like about roughly 18 months?

3    A.    Probably so.

4    Q.    And before that, the Hancock County

5          Sheriff's Office, were you a deputy

6          anywhere else?

7    A.    Pearl River County.

8    Q.    When did you start at Pearl River

9          County?

10   A.    '85.

11   Q.    How long did you work at the Pearl River

12         County Sheriff's Office?

13   A.    Up until the first of January 2000.  The

14         sheriff lost the election and when the

15         turnover happened, that's when I left.

16   Q.    So you left on your own volition from

17         the Pearl River County Sheriff's Office?

18   A.    Oh, yes, sir.

19   Q.    Same thing as the Hancock County, you

20         put your two weeks in and that was it?

21   A.    Yes, sir.

22   Q.    So if I'm correct here, and correct me

23         if I'm wrong, the last time you were a

24         sheriff's deputy was in July of 2001 for

25         the Hancock County Sheriff's Office?

1    A.    Yes, sir.

2    Q.    Are you married?

3    A.    Yes, sir.

4    Q.    Do you have any kids?

5    A.    Yes, sir.

6    Q.    How many?

7    A.    I got three kids and I got three step-

8          kids.

9    Q.    Have you had a chance to review the

10         police report from the incident from

11         which you filed this lawsuit about?

12   A.    No, sir.

13   Q.    You haven't?  Okay.  On September 16th

14         of 2015, do you recall what you were

15         doing that day?

16   A.    Was that the day I was arrested?

17   Q.    Yeah, that would have been the day of

18         the arrest.

19   A.    It was the 16th?

20   Q.    I'm sorry, the 15th, I apologize.

21         MS. BARBER:

22             I --

23         THE WITNESS:

24             I don't think -- I think it was like

25         the 8th or the 9th.

1    BY MR. MARTINY:

2    Q.    I'm sorry, September the 8th, I

3          apologize.  The report was supplemented

4          on the 15th.  On September 8th, 2015, do

5          you remember what you were doing that

6          day?

7    A.    I was driving to go see my wife at work.

8    Q.    And where does your wife work that day?

9    A.    For the parish at Parks and Recreation

10         on Lapalco, Jefferson Parish recreation

11         department.

12   Q.    So you were on your way over there to go

13         see your wife?

14   A.    Mm-hmm.

15   Q.    And is that when you were pulled over?

16   A.    Yes, sir.

17   Q.    I'm going to have you look at this

18         report, give you a couple of minutes.

19   MR. MARTINY:

20         Have you seen this yet?

21   MS. BARBER:

22         Yes, I have.

23   BY MR. MARTINY:

24   Q.    Just take your time.  Just review not

25         just the highlighted part, just the

1          whole narrative report, just take your

2          time.  There's no rush.  I'm just going

3          to ask you some questions about it.

4     A.    (Witness complies.)

5                    (Off the record 9:15 a.m.

6              Back on the record 9:21 a.m.)

7     BY MR. MARTINY:

8     Q.    Real quick before I get to this, and

9          correct me if I'm wrong, I know we went

10         through previously you said you were a

11         Hancock County sheriff's deputy and a

12         Pearl River County sheriff's deputy?

13    A.    Mm-hmm.

14    Q.    Were you ever a deputy in Louisiana?

15    A.    Yes.

16    Q.    Where at?

17    A.    Jefferson Parish.

18    Q.    When were you a Jefferson Parish deputy?

19    A.    1984 to 1986.

20    Q.    '84 to '86.  And why did you leave the

21         Jefferson Parish Sheriff's Office in

22         '86?

23    A.    I was terminated.

24    Q.    Why were you terminated?

25    A.    Pink slip read misconduct and use of

1          alcohol off duty.

2     Q.   I'm looking at your complaint here and

3          it says you're now disabled?

4     A.   Yeah, I've been disabled since 2008.  I

5          was disabled once before in 1992 I think

6          -- no, 1991.  I was rear-ended with a

7          group of guys going down on a fishing

8          trip and blew out three levels of my

9          back.  They had to put metal in.  I've

10         got six screws and two plates so I was

11         on disability for that for about a year,

12         started working out again once it was

13         healed, got off Social Security, went

14         back through Mississippi's academy and

15         was certified in Mississippi also and

16         worked until I got hurt again in 2008.

17    Q.   And how did you get hurt in 2008?

18    A.   Slip-and-fall, broke a rib and messed my

19         back up again and my shoulder.

20    Q.   Mr. Weisler, a few minutes ago I gave

21         you a copy of this report and I believe

22         you said you've now had a chance to

23         review that report?

24    A.   Mm-hmm, yes.

25    Q.   On first glance of your initial read-

```
 1              through, is there anything in this
 2              report that you would disagree with
 3              factually that you would say after
 4              reading it, that is not what happened in
 5              this incident that would jump out to
 6              you?  I'm going to go through it
 7              individually but is there anything in
 8              there that you would vehemently disagree
 9              with as not being factual?
10   A.   (No response.)
11   Q.   And I'll give you a copy if you want to
12        review it while you're sitting there.
13        I'm not trying to trick you.
14   A.   Let me see one part.
15   Q.   Sure.
16   A.   The only thing that I see right now that
17        jumps out at me is, he didn't ask me if
18        I was a law enforcement officer.  He
19        asked me if I was a 26.
20   Q.   And what does a 26 mean?
21   A.   Law enforcement officer.
22   Q.   So he essentially asked you the same
23        question, he just used a different way
24        of saying it?
25   A.   Right, and if I wasn't a law enforcement
```

```
 1            officer, I wouldn't know what a 26 was.
 2   Q.   All right.  So on that day, you were, in
 3        fact, driving a white Crown Victoria
 4        with a license plate SHV 120?
 5   A.   Yes, sir.
 6   Q.   And was that vehicle tinted?
 7   A.   Yes, sir.
 8   Q.   Did that vehicle have a computer stand
 9        in the front?
10   A.   Yes, sir.
11   Q.   Did it have emergency lights on the
12        front dash?
13   A.   Yes, sir.
14   Q.   Was there an emergency siren on the
15        front grill?
16   A.   Yes.
17   Q.   And you just said you were asked if you
18        were 26, right?
19   A.   Yes, sir.
20   Q.   And again just to clarify, you said that
21        means are you a current law enforcement
22        officer or are you just law enforcement?
23   A.   I just took it to mean, you know, are
24        you a cop, you know.  I didn't -- I just
25        didn't say that I was retired at the
```

1          time and that's about it.

2     Q.   So when they asked you if you were a 26,

3          you said yes?

4     A.   Yes.

5     Q.   And did you have credentials on you that

6          day?

7     A.   Yes.

8     Q.   What were those credentials?

9     A.   I had an identification from Hancock and

10         Pearl River County.

11    Q.   Did you produce the paper in your wallet

12         from the Hancock County Sheriff's

13         Office?

14    A.   Yes, sir.

15    Q.   And what does that paper say?

16    A.   It says that I was a deputy for Hancock

17         County Sheriff's Office.

18    Q.   Does that mean a current deputy?

19    A.   No, the only reason I carried it is that

20         it was like extra identification.

21    Q.   But in fact, on September 8th, 2015 you

22         weren't a member of the Hancock County

23         Sheriff's Department?

24    A.   No, sir.

25    Q.   So when you presented them with that

1          documentation, that didn't infer that

2          you were a current Hancock County

3          Sheriff's Deputy?

4     A.   I told him I was retired before I gave

5          it to him.

6     Q.   Okay.

7     A.   He asked me to prove that I used to be a

8          police officer.

9     Q.   Who is Steve Garber?

10    A.   He was the sheriff of Hancock County.

11    Q.   And he would have been the sheriff when

12         you worked there?

13    A.   Yes, sir.

14    Q.   Is that the one that you said when he

15         lost the election, you ended up leaving?

16    A.   No, that was the one before.

17    Q.   All right.  On that day when you were

18         pulled over, did you have two laminated

19         cards identifying you as a deputy for

20         Pearl River County with a date of

21         2/14/96?

22    A.   Yes, sir.

23    Q.   And who's Dan McNeill?

24    A.   Sheriff of Pearl River County.

25    Q.   Is he still currently the sheriff?

| | | |
|---|---|---|
| 1 | A. | No, sir, he lost the election. |
| 2 | Q. | He's the one that lost? |
| 3 | A. | The election in 2000. |
| 4 | Q. | Did you formally retire from Pearl |
| 5 | | River? |
| 6 | A. | No, sir. |
| 7 | Q. | So that would have been technically your |
| 8 | | resignation? |
| 9 | A. | Yes, sir. |
| 10 | Q. | And that would have been the same, you |
| 11 | | would have resigned from Hancock County? |
| 12 | | You hadn't retired from Hancock County |
| 13 | | Sheriff's Office, right? |
| 14 | A. | Yes, sir. |
| 15 | Q. | Yes to the resignation? |
| 16 | A. | Yes, sir. |
| 17 | Q. | You said earlier I believe, just correct |
| 18 | | me if I'm wrong, that the reason you |
| 19 | | left the police force in Mississippi the |
| 20 | | last time you were a deputy there was |
| 21 | | the commute wasn't working out for you? |
| 22 | A. | Yeah, it was just getting too hard. |
| 23 | Q. | There was no like punishment or anything |
| 24 | | like that or termination from there? |
| 25 | A. | No, sir.  That year, I was awarded |

| | | |
|---|---|---|
| 1 | | policeman of the year in Hancock County. |
| 2 | Q. | So on that date, I think we agreed it |
| 3 | | was September 8th of '15 was the |
| 4 | | incident, was the time you were pulled |
| 5 | | over.  You, in fact, hadn't been a |
| 6 | | deputy for either Hancock County or |
| 7 | | Pearl River for nearly 20 years? |
| 8 | A. | What's that, sir? |
| 9 | Q. | So you were pulled over, we've agreed |
| 10 | | that it's September 8th of 2015 when you |
| 11 | | were pulled over for this incident. |
| 12 | A. | Yes, sir. |
| 13 | Q. | And as of that date, you hadn't been an |
| 14 | | active member of either the Hancock or |
| 15 | | the Pearl River Police Departments for |
| 16 | | nearly 20 years? |
| 17 | A. | Well, -- |
| 18 | Q. | You said '96 was -- |
| 19 | A. | No, 2001 is the last time I was a |
| 20 | | deputy. |
| 21 | Q. | Okay. |
| 22 | A. | So up until '15, that's 14 years. |
| 23 | Q. | I apologize, that's my mistake.  So from |
| 24 | | 2001 was the last time you were actually |
| 25 | | an active police officer? |

| | | |
|---|---|---|
| 1 | A. | Yes, sir. |
| 2 | Q. | On this day when you were pulled over |
| 3 | | after I believe you all had a discussion |
| 4 | | about whether you were a police officer |
| 5 | | or not, did there come a point in time |
| 6 | | where you were searched? |
| 7 | A. | After I was arrested. |
| 8 | Q. | And when you were searched, was anything |
| 9 | | found? |
| 10 | A. | My medicine. |
| 11 | Q. | What medicine were you in possession of |
| 12 | | that day? |
| 13 | A. | Oxycodone, Soma, Zoloft, Wellbutrin, |
| 14 | | over-the-counter heartburn medicine, |
| 15 | | baby aspirin. |
| 16 | Q. | Is oxycodone a pain medicine? |
| 17 | A. | Yes, sir. |
| 18 | Q. | What about Soma, is Soma a pain |
| 19 | | medicine? |
| 20 | A. | Soma's a muscle relaxer. |
| 21 | Q. | And what is Zoloft? |
| 22 | A. | Depression. |
| 23 | Q. | What about Wellbutrin? |
| 24 | A. | Depression. |
| 25 | Q. | Depression, okay.  And where were these |

| | | |
|---|---|---|
| 1 | | medications on your person? |
| 2 | A. | In my right pocket. |
| 3 | Q. | And were they in a prescription bottle? |
| 4 | A. | Yes, sir. |
| 5 | Q. | They were?  But they were all mixed |
| 6 | | together in one bottle? |
| 7 | A. | Yes, sir. |
| 8 | Q. | What prescription bottle, what prescrip- |
| 9 | | tion was on that bottle, if you recall? |
| 10 | A. | That was the extended relief morphine. |
| 11 | Q. | So it would be fair to say that when |
| 12 | | they concluded the search on you and |
| 13 | | found these medications, you didn't have |
| 14 | | a prescription for all of them?  You |
| 15 | | only had the prescription bottle for the |
| 16 | | morphine?  You didn't have a prescrip- |
| 17 | | tion bottle for the oxycodone? |
| 18 | A. | No, sir. |
| 19 | Q. | Did you have a prescription bottle for |
| 20 | | the Soma? |
| 21 | A. | No, sir. |
| 22 | Q. | So they were all just mixed together in |
| 23 | | one bottle? |
| 24 | A. | Yes, sir. |
| 25 | Q. | Did you have any morphine on you? |

1    A.    No, sir.

2    Q.    So it was just a random bottle that you

3          just happened to put these in that day?

4    A.    That day, I was told I had to come back

5          to get it filled, they didn't have the

6          medicine, the morphine.  That's why I

7          didn't have morphine with me.

8    Q.    So why were those pills in the morphine

9          bottle I guess is what I'm asking?

10   A.    I just thought that the morphine being

11         the strongest drug, I was going to put

12         that in there.  It's kind of hard, I get

13         bottles that are this big (witness

14         indicating) and I got like six or seven

15         prescriptions.  I would have to carry a

16         grocery bag to carry all those with me

17         so I did the easy thing and put my

18         medicine for the day in the bottle and

19         that was it.

20   Q.    So you just grabbed a random bottle and

21         decided to take all the medications you

22         were taking that day and put it in

23         there?

24   A.    No, sir.  I grabbed the morphine bottle

25         because that was the strongest medicine

| | | |
|---|---|---|
| 1 | | I took so I thought that might be, you |
| 2 | | know, the one I need to prove more than |
| 3 | | the other if something happened. |
| 4 | Q. | So if you were to get in a situation |
| 5 | | like you ultimately found yourself in, |
| 6 | | -- |
| 7 | A. | Yes, sir. |
| 8 | Q. | -- having the morphine bottle would have |
| 9 | | been -- |
| 10 | A. | Well, it's better than having pain |
| 11 | | medicine in a Zoloft bottle. |
| 12 | Q. | Do you take all those medications on the |
| 13 | | same day?  Is that why you had them all |
| 14 | | in your possession that day? |
| 15 | A. | Throughout the day. |
| 16 | Q. | So when that search was concluded and |
| 17 | | they found those medications, did you |
| 18 | | have anything on your possession that |
| 19 | | day that showed that those pills that |
| 20 | | were found on your person belonged to |
| 21 | | you? |
| 22 | A. | No, sir. |
| 23 | Q. | So the only thing you had on your person |
| 24 | | that showed any kind of prescription for |
| 25 | | you was the morphine? |

```
 1   A.   Right, which I didn't pick up because it
 2        was coming in the next day.
 3   Q.   So would it be fair to say that it would
 4        be hard for you to tell somebody that
 5        those medications belonged to you?
 6   A.   Could always --
 7   Q.   Excuse me, strike that, were prescribed
 8        to you?
 9   A.   Yes, I told him I could take them to the
10        house and show them to him.
11   Q.   But again you didn't have anything on
12        you?
13   A.   No, sir.
14   Q.   I want to ask you a question.  I would
15        like you to tell me, this is Jose
16        Alvarado.
17        MR. ALVARADO:
18             Julio.
19   BY MR. MARTINY:
20   Q.   Julio, I'm sorry.  Can you tell me how
21        he violated your constitutional rights
22        with this stop?
23        MS. BARBER:
24             I have to object for the record that
25        it seeks a legal conclusion.
```

BY MR. MARTINY:

Q.    Can you answer that?  I note her objec-
      tion but if you can answer that?  What
      did he do to violate your rights on that
      day?

A.    I was stopped -- I was stopped by
      Detective Michel.  He asked me if I was
      a 26 and I said yes.  Then he asked me
      can you prove it.  The only way I could
      prove it was to show him the IDs I had
      and before I showed him, I said you know
      I'm retired now.  I'm disabled.  When
      people ask me what you do, I'm retired.
      I'm not going to say I'm disabled.  I
      got hurt.  I'm on Social Security
      disability.  I don't go through all
      that.  I just say I'm retired.  They
      don't need to know that.  So when he
      came up to me and he said you're under
      arrest for impersonating a police
      officer --

Q.    Who's he?  Is this Michel?

A.    Michel.

Q.    Okay.

A.    And Alvarado, I think you said that you

```
 1            called Hancock County?
 2   Q.    He can't --
 3   A.    Okay.  Well, he called Hancock County or
 4         one of them did and they told me that
 5         Hancock County said that I was run off,
 6         not that I resigned, I was run off.
 7         That's not in there.
 8   Q.    You can keep going.  I'm not asking you
 9         anything.
10   A.    Okay.  So when I was told that I was
11         arrested for impersonating a police
12         officer, being that I was POST certified
13         in Louisiana, I kind of know -- I kind
14         of know the statutes and I don't think
15         what I was doing fit the statute.  The
16         statute says that I'm trying to get some
17         kind of gain out of this.
18   Q.    Okay, that's fine.  Did they say why
19         they pulled you over to start when you
20         first got pulled over?  Do you know why
21         you got pulled over?
22   A.    No, sir.
23   Q.    I'm going to show you this police
24         report, Page 5, and again, you said
25         earlier that there was only one thing
```

```
 1           you addressed that you would disagree
 2           with factually.  I'm going to look at
 3           this third paragraph here where I
 4           believe you said Sergeant Alvarado said
 5           that you were run off.  If you could
 6           read that third paragraph.  You don't
 7           have to read it aloud, just to yourself.
 8    A.     (Witness complies.)
 9    Q.     So him saying that he cannot confirm nor
10           deny a reason to you means you were run
11           off?
12    A.     He didn't tell me that.
13    Q.     So he told you you were run off?
14    A.     Yes, sir.
15    Q.     Eventually you were charged I believe
16           with possession of those medications we
17           talked about, impersonating a police
18           officer and illegal tint; is that
19           correct?
20    A.     Illegal tint, I was issued a citation
21           which I signed.
22    Q.     Which you pled guilty to?
23    A.     Yes.
24    Q.     So you pled guilty to illegal tint?
25    A.     I had illegal tint.  I paid it.
```

| | | |
|---|---|---|
| 1 | Q. | And you pled guilty to that? |
| 2 | A. | Yes. |
| 3 | Q. | Did there come a point in time during |
| 4 | | your criminal process where you provided |
| 5 | | a prescription to the DA's office? |
| 6 | A. | Yes. |
| 7 | Q. | And at that point, what did they do? |
| 8 | A. | They asked me to go to the pharmacy and |
| 9 | | get a printout.  I did that and they |
| 10 | | threw out the charges.  The imperson- |
| 11 | | ating a police officer, they threw that |
| 12 | | out.  The judge if I can remember right, |
| 13 | | I think he thanked me for my service and |
| 14 | | when I was leaving, the assistant |
| 15 | | district attorney shook my hand and gave |
| 16 | | me one of these like (witness |
| 17 | | indicating). |
| 18 | Q. | What specific injuries are you claiming |
| 19 | | you have suffered as a result of this |
| 20 | | incident? |
| 21 | A. | None. |
| 22 | Q. | So you have no injuries? |
| 23 | A. | Physical? |
| 24 | Q. | Physical, financial, anything.  What are |
| 25 | | your damages as a result of this |

```
 1        incident?
 2   A.   Most of all, and I don't understand how
 3        it got on -- in the paper, that big
 4        picture of me in the paper saying that
 5        -- and if I'm not mistaken, I thought
 6        they had with intent at first to
 7        distribute.
 8   Q.   Intent to distribute, what, the
 9        medication?
10   A.   Yes.
11   Q.   Okay.
12   A.   And I think the district attorney kind
13        of -- and this is me just guessing.  I'm
14        not sure.  But I thought it was with
15        intent at the time and then they dropped
16        it down to just possession so I'm in the
17        paper.  I've got friends, another
18        policeman and people that are just
19        acquaintances and now they got a big
20        picture of me in the paper saying that I
21        was impersonating a police officer.  I
22        was trying to -- I had all these pills
23        with me that I wasn't supposed to have,
24        you know.  My reputation's just shot.
25             My finances right now are in bad
```

```
1          shape and I needed to go back to work
2          even if it was part-time to make some
3          money.  And with my resumé, I could get
4          a good job in the security field but
5          with this on my record, nobody would
6          hire me.  I just know.  I don't even
7          try.  Would you hire somebody to carry a
8          gun and all this with seven felonies on
9          his record?
10   Q.    Unfortunately you don't get to ask me
11         any questions here.
12   A.    Sorry.
13   Q.    I don't make the rule.  I'm just saying
14         I can't.
15   A.    No, that's fine.
16   Q.    So you haven't applied anywhere since
17         this incident?
18   A.    No, sir.
19   Q.    So you're just assuming that nobody
20         would hire you because you were charged
21         with this, not ultimately convicted,
22         just charged?
23   A.    Yes, sir.
24   Q.    Is there any work that you know of that
25         you were looked over for such as like
```

1        consulting or anything that you know for

2        a fact you were looked over for because

3        of this incident?

4    A.   No, sir.

5    Q.   So there's nothing that you can point to

6        specifically that shows an element of

7        loss on your behalf due to this

8        incident?

9        MS. BARBER:

10           I have to object for the record that

11        mischaracterizes his prior testimony.

12   BY MR. MARTINY:

13   Q.   Can you point to anything specifically

14        that you can point to as a loss which

15        occurred directly as a result of this,

16        you being pulled over and put in the

17        paper?

18   A.   I can't go to work.

19   Q.   But you've already said you haven't

20        tried; is that correct?  You haven't

21        applied anywhere?

22   A.   But I know that in my field, nobody --

23        when I was at Stennis, I did the hiring,

24        okay?  If somebody came to me and wanted

25        to work on a government facility

```
 1         carrying a weapon and he had seven
 2         felonies and it takes awhile for, you
 3         know, the not-guilty stuff to get in
 4         there too.  It's not like the next day
 5         when you leave court all of a sudden
 6         your record says you were not guilty.
 7         There's a lag time and I just know that
 8         I would never hire anybody and I know
 9         there's no way that anybody would hire
10         me to work.
11    Q.   What are the seven felonies you're
12         talking about?  Is that what you were
13         initially charged with?
14    A.   I don't know if it's seven or six.  It
15         was impersonating a police officer.  It
16         was for the pain medicine.  It was for
17         the muscle relaxer.  It was for Zoloft.
18         It was for the other depression medicine
19         and he charged me with possession of a
20         dangerous controlled substance,
21         ranitidine which is over-the-counter
22         heartburn medicine.
23    Q.   Have you run your name for a record?
24    A.   I had pawned one of my AR-15s to a pawn
25         shop and I had to wait like four months
```

```
 1            to get it out because I was told that if
 2            I did it now and the record wasn't clear
 3            yet, that it would be flagged and I
 4            would have a problem getting it out
 5            later so I had to just wait to get my
 6            gun out.  And then even that, they
 7            wouldn't approve it that day.  I had to
 8            wait four days for them to figure out,
 9            you know, whether I can have my gun back
10            or not being the government.
11    Q.     So you don't know whether these -- if
12            you run your name in a search, does this
13            information come up, the felonies that
14            you're saying, the seven felonies?
15    A.     You run my name in a search, you're
16            going to get a NOLA article with a
17            picture of me.  You're going to get a
18            Times Picayune article with a picture of
19            me.  Anybody ever Googles me, the first
20            thing they're going to see is that
21            Marrero man arrested for impersonating a
22            police officer and possession of drugs.
23    Q.     But again, if someone does a background
24            check of your name, are you saying that
25            the seven felonies as you keep saying
```

```
1              would come up --
2    A.    Or six.
3    Q.    -- would come up as guilty?
4    A.    No, no, no.  I'm just saying that I had
5              to wait until the not-guilty stuff was
6              put into the record.  It wasn't like I
7              can go -- the day after court, I can go
8              get my gun back.  I waited three months,
9              four months and finally went back to get
10             my gun and it was denied at first
11             because they had to check into it and I
12             had to wait four or five days and they
13             finally said it was okay.
14   Q.    So do you have any other specific
15             damages you can point to that you have
16             suffered as a result of this incident?
17   A.    Just ruining my reputation, my -- when
18             your livelihood -- when you need to
19             work, this is all I know.  I started
20             with JP when I was 20 so, you know, if I
21             want to make money, I guess I could go
22             to McDonald's and all and make seven,
23             eight bucks an hour but I was getting
24             paid twenty-something dollars an hour
25             because of, you know, all my experience
```

```
 1           with being security, with the sheriff's
 2           offices and nobody would hire me.  I
 3           know it.
 4    Q.     But again you're saying that nobody
 5           would hire you, you know it just based
 6           on your own belief?  You haven't
 7           specifically tried to apply for any law-
 8           enforcement position since this
 9           incident, have you?
10    A.     No, sir.
11    Q.     So the only person that's told you that
12           you don't think you could be hired as a
13           law enforcement officer is you?
14    A.     (No response.)
15    Q.     You've had no specific job come to you
16           and say look, man, I can't hire you
17           because of these charges that were
18           against you?
19    A.     No, sir.
20           MR. MARTINY:
21               Can I take a five-minute break?
22           MS. BARBER:
23               Sure.
24                   (Off the record 9:50 a.m.
25               Back on the record 9:55 a.m.)
```

```
 1   BY MR. MARTINY:
 2   Q.   I just have a few more questions.  Were
 3        you represented by an attorney at your
 4        criminal trial, at the criminal process?
 5   A.   Yes, sir.
 6   Q.   Did your criminal attorney ever
 7        challenge the search, the legality of
 8        the search, do you recall?
 9   A.   I don't think so.  The only thing I know
10        is that he had all my POST certifica-
11        tions and, you know, my commendations
12        and awards and he just told the judge
13        that I was a decorated police officer.
14   Q.   So you don't know if they actually
15        challenged the legality of the seizure?
16   A.   I don't know if it got that far.
17   Q.   Do you know, did your criminal attorney
18        challenge the legality of you being
19        arrested?
20   A.   No, sir.
21   Q.   You don't know or no, he did not?
22   A.   I don't know.
23   MR. MARTINY:
24        I don't have any further questions.
25   MS. BARBER:
```

```
 1                May I just take a little bit of
 2          redirect?
 3          MR. MARTINY:
 4                Sure.
 5   BY MS. BARBER:
 6   Q.     Did you make it clear to the officers on
 7          September 8th that you were no longer an
 8          active police officer?
 9   A.     When he asked me to prove that I was a
10          police officer, I told him I was
11          retired.
12   Q.     Did you tell him you were retired, no
13          longer an active police officer before
14          or after you were arrested for imper-
15          sonation?
16   A.     Before.
17   Q.     Did you on that day have valid current
18          prescriptions for the medications that
19          you had?
20   A.     Yes.
21   Q.     Did you tell the officers that?
22   A.     Yes.
23   Q.     Did they find and ask you about those
24          medications before or after you were
25          arrested?
```

```
 1    A.    After.
 2    Q.    Has this incident impacted you
 3          emotionally?
 4    A.    Yes.
 5    Q.    Can you describe that impact?
 6    A.    It's hard to describe.  I just -- just
 7          thinking about relatives because a lot
 8          of people don't even know I was
 9          arrested.  And then some people call me
10          oh, I seen this.  It's just I worked so
11          hard to have, you know -- to be a good
12          policeman and do the right thing, you
13          know.  It's like -- it's like, you know,
14          have you ever heard once a Marine always
15          a Marine?  Once a cop always a cop?
16          Something like that.
17    Q.    Okay.
18    A.    If I was -- if I'm driving down the
19          road, I'm like a Boy Scout, I like to be
20          prepared.  Also in that car was first
21          aid, jump box, tools.  If I seen some-
22          body on the side of the road that needed
23          help or seen a policeman fighting on the
24          street, I'm going to be the one that
25          stops.  I'll stop at an accident and
```

| | |
|---|---|
| 1 | I'll help them with their injuries till |
| 2 | EMS gets there and I've done that. |
| 3 | I was the first one there to talk to |
| 4 | the deputy that T-boned that lady on |
| 5 | Barataria and subsequently she died but |
| 6 | I was the first one there and I was |
| 7 | talking to him. He looked like he was |
| 8 | kind of -- I don't know if he was in |
| 9 | shock but he was headed that way because |
| 10 | he told me he couldn't believe she |
| 11 | pulled out but I did try to render him |
| 12 | first aid until they got there. |
| 13 | Q. Did you talk about your experience as an |
| 14 | officer with the intent to injure |
| 15 | anyone? |
| 16 | A. No. |
| 17 | Q. Did you intend to injure anyone? |
| 18 | A. No, ma'am. |
| 19 | Q. Did you intend to defraud anyone? |
| 20 | A. No, ma'am. |
| 21 | Q. Were you trying to get any special |
| 22 | advantage? |
| 23 | A. No, ma'am, I just answered his question. |
| 24 | Q. Did you ask him to not give you a |
| 25 | citation for the window tint because you |

```
 1          were a police officer?
 2   A.     No, ma'am.
 3          MS. BARBER:
 4              No further questions.
 5   BY MR. MARTINY:
 6   Q.     I just have a few follow-up.  Your
 7          attorney I believe just asked you if you
 8          had prescriptions for the medication you
 9          had that day?
10   A.     Yes.
11   Q.     I believe you said yes, right?  Just to
12          be clear, though, you didn't have any of
13          those prescriptions for those individual
14          medications which were found in your
15          possession when you were pulled over?
16   A.     No.
17   Q.     And all of those individual medications
18          including oxycodone, Soma, Zoloft,
19          Wellbutrin amongst others were found
20          inside of a morphine prescription
21          bottle, correct?
22   A.     Yes, sir.
23   Q.     So they were not in their own individual
24          bottles?
25   A.     No, sir.
```

1    Q.    I have no further questions.

2              (Deposition ends 10:00 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               C E R T I F I C A T E

2     I, ANN M. DOWNS, Certified Court

3 Reporter, in and for the State of Louisiana,

4 as an officer before whom this testimony was

5 taken, do hereby certify that ROBERT R.

6 WEISLER, III, after having been duly sworn by

7 me upon authority of R.S. 37:2554, did

8 testify as hereinbefore set forth in the

9 foregoing 43 pages; that this testimony was

10 reported by me in the stenotype reporting

11 method, was prepared and transcribed by me or

12 under my personal direction and supervision,

13 and is a true and correct transcript to the

14 best of my ability and understanding.

15     That the transcript has been prepared in

16 compliance with transcript format guidelines

17 required by the statute or by rules of the

18 board, and that I am informed about the

19 complete arrangement, financial or otherwise,

20 with the person or entity making arrangements

21 for deposition services; that I have acted in

22 compliance with the prohibition on

23 contractual relationships, as defined by

24 Louisiana Code of Civil Procedure Article

25 1434 and in rules and advisory opinions of

1 the board; that I have no actual knowledge

2 of any prohibited employment or contractual

3 relationship, direct or indirect, between a

4 court reporting firm and any party litigant

5 in this matter nor is there any such

6 relationship between myself and a party

7 litigant in this matter.  I am not related to

8 counsel or to the parties herein, nor am I

9 otherwise interested in the outcome of this

10 matter.

11      This certification is valid only for a

12 transcript accompanied by my original

13 signature and original stamped seal on this

14 page.

15

16

17

18

19

20

21

22 _____

ANN M. DOWNS

23 Certified Court Reporter

State of Louisiana

24 Certificate Number 81041

25